**Charles HOLT, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. CIV.A.03–G–2926–S.**

United States District Court, N.D. Alabama, Southern Division.

Feb. 3, 2005.

---

R. Michael Booker, R. Michael Booker PC, Birmingham, AL, for Plaintiff.

Alice H. Martin and Edward Q. Ragland, US Attorney's Office, Birmingham, AL, for Defendant.

## MEMORANDUM OPINION

GUIN, District Judge.

The plaintiff, Charles Holt, brings this action pursuant to the provisions of section

205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration (the Commissioner). In July 1996 plaintiff's disability benefits were ceased after it was determined that plaintiff had experienced medical improvement and was no longer disabled. The cessation was affirmed by ALJ Jerome L. Munford in a hearing decision issued June 27, 2001. Plaintiff timely pursued and exhausted his administrative remedies available before the Commissioner. Accordingly, this case is now ripe for judicial review under 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir.1983). To that end this court "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth,* at 1239 (citations omitted). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Bloodsworth,* at 1239.

## STATUTORY AND REGULATORY FRAMEWORK

In determining whether a claimant's disability benefits should be terminated, Social Security regulations outline an eight-step sequential process:

Evaluation steps. To assure that disability reviews are carried out in a uniform manner, that decisions of continuing disability can be made in the most expeditious and administratively efficient way, and that any decisions to stop disability benefits are made objectively, neutrally and are fully documented, we will follow specific steps in reviewing the question of whether your disability continues. Our review may cease and benefits may be continued at any point if we determine there is sufficient evidence to find that you are still unable to engage in substantial gainful activity. The steps are:

(1) Are you engaging in substantial gainful activity? If you are (and any applicable trial work period has been completed), we will find disability to have ended (see paragraph (d)(5) of this section).

(2) If you are not, do you have an impairment or combination of impairments which meets or equals the severity of an impairment listed in Appendix 1 of this subpart? If you do, your disability will be found to continue.

(3) If you do not, has there been medical improvement as defined in paragraph (b)(1) of this section? If there has been medical improvement as shown by a decrease in medical severity, see step (4). If there has been no decrease in medical severity, there has been no medical improvement. (See step (5).)

(4) If there has been medical improvement, we must determine whether it is related to your ability to do work in accordance with paragraphs (b)(1)-(4) of this section; i.e., whether or not there has been an increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination. If medical improvement is not related to your ability to do work, see step (5). If medical improvement is related to your ability to do work, see step (6).

(5) If we found at step (3) that there has been no medical improvement or if we found at step (4) that the medi-

cal improvement is not related to your ability to work, we consider whether any of the exceptions in paragraphs (d) and (e) of this section apply. If none of them apply, your disability will be found to continue. If one of the first group of exceptions to medical improvement applies, see step (6). If an exception from the second group of exceptions to medical improvement applies, your disability will be found to have ended. The second group of exceptions to medical improvement may be considered at any point in this process.

(6) If medical improvement is shown to be related to your ability to do work or if one of the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe (see § 404.1521). This determination will consider all your current impairments and the impact of the combination of those impairments on your ability to function. If the residual functional capacity assessment in step (4) above shows significant limitation of your ability to do basic work activities, see step (7). When the evidence shows that all your current impairments in combination do not significantly limit your physical or mental abilities to do basic work activities, these impairments will not be considered severe in nature. If so, you will no longer be considered to be disabled.

(7) If your impairment(s) is severe, we will assess your current ability to engage in substantial gainful activity in accordance with § 404.1561. That is, we will assess your residual functional capacity based on all your current impairments and consider whether you can still do work you have done in the past. If you can do such work, disability will be found to have ended.

(8) If you are not able to do work you have done in the past, we will consider one final step. Given the residual functional capacity assessment and considering your age, education and past work experience, can you do other work? If you can, disability will be found to have ended. If you cannot, disability will be found to continue.

20 C.F.R. § 404.1594(f).

In the instant case, the ALJ, Jerome L. Munford, found the plaintiff was unable to perform his past relevant work. Once it is determined that the plaintiff cannot return to his prior work, "the burden shifts to the [Commissioner] to show other work the claimant can do." *Foote v. Chater,* 67 F.3d 1553, 1559 (11th Cir.1995). Furthermore, when, as is the case here, a claimant is not able to perform the full range of work at a particular exertional level, the Commissioner may not exclusively rely on the Medical–Vocational Guidelines (the grids). *Foote,* at 1558–59. The presence of a nonexertional impairment, pain, also prevents exclusive reliance on the grids. *Foote,* at 1559. In such cases "the [Commissioner] must seek expert vocational testimony." *Foote,* at 1559.

## THE STANDARD WHEN THE CLAIMANT TESTIFIES HE SUFFERS FROM DISABLING PAIN

■ In this circuit, "a three part 'pain standard' [is applied] when a claimant seeks to establish disability through his or her own testimony of pain or other subjective symptoms." *Foote,* at 1560.

The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* at 1560 (quoting *Holt v. Sullivan,* 921 F.2d 1221, 1223 (11th Cir.1991)). In this circuit medical evidence of pain itself, or of its intensity, is not required.

While both the regulations and the *Hand* standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, *neither requires objective proof of the pain itself.* Thus under both the regulations and the first (objectively identifiable condition) and third (reasonably expected to cause pain alleged) parts of the *Hand* standard *a claimant who can show that his condition could reasonably be expected to give rise to the pain he alleges has established a claim of disability and is not required to produce additional, objective proof of the pain itself. See* 20 CFR §§ 404.1529 and 416.929; *Hale* at 1011.

*Elam v. Railroad Retirement Bd.,* 921 F.2d 1210, 1215 (11th Cir.1991)(parenthetical information omitted)(emphasis added). Furthermore, it must be kept in mind that "[a] claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability." *Foote* at 1561. Therefore, if a claimant testifies to disabling pain and satisfies the three part pain standard, he must be found disabled unless that testimony is properly discredited.

 When the Commissioner fails to credit a claimant's pain testimony, he must articulate reasons for that decision.

It is established in this circuit that if the Secretary fails to articulate reasons for refusing to credit a claimant's subjective pain testimony, then the Secretary, as a matter of law, has accepted that testimony as true. Implicit in this rule is the requirement that such articulation of reasons by the Secretary be supported by substantial evidence.

*Hale v. Bowen,* 831 F.2d 1007, 1012 (11th Cir.1987). Therefore, if the ALJ either fails to articulate reasons for refusing to credit the plaintiff's pain testimony, or if his reasons are not supported by substantial evidence, the pain testimony of the plaintiff must be accepted as true.

## THE STANDARD FOR REJECTING THE TESTIMONY OF A TREATING PHYSICIAN

 As the Sixth Circuit has noted: "It is firmly established that the medical opinion of a treating physician must be accorded greater weight than those of physicians employed by the government to defend against a disability claim." *Hall v. Bowen,* 837 F.2d 272, 276 (6th Cir.1988). "The testimony of a treating physician must ordinarily be given substantial or considerable weight unless good cause is shown to the contrary." *MacGregor v. Bowen,* 786 F.2d 1050, 1053 (11th Cir. 1986); *accord Elam v. Railroad Retirement Bd.,* 921 F.2d 1210, 1216 (11th Cir. 1991). In addition, the Commissioner "must specify what weight is given to a treating physician's opinion and any reason for giving it no weight ...." *MacGregor,* 786 F.2d at 1053. If the Commissioner ignores or fails to properly refute a treating physician's testimony, as a matter of law that testimony must be accepted as true. *MacGregor,* 786 F.2d at 1053; *Elam,* 921 F.2d at 1216. The Commissioner's reasons for refusing to credit a claimant's treating physician must be supported by substantial evidence. *See MacGregor,* 786 F.2d at 1054; *cf. Hale v. Bowen,* 831 F.2d 1007, 1012 (11th Cir.1987)(articulation of reasons for not crediting a claimant's subjective pain testimony must be supported by substantial evidence).

## DISCUSSION

A statement from the plaintiff's orthopedic surgeon, Dr. Flanagan, dated May 31, 1996, contains the following:

Mr. Holt is 100% disabled and has been since sustaining multiple fractures on September 4, 1991. '... He will be undergoing lumbar spine surgery, cervical spine surgery, and left total knee replacement arthroplasty in the near future.

[R 398]

The plaintiff underwent a consultive orthopedic evaluation by Dr. Morton on June 7, 1996. Dr. Morton found decreased range of motion (ROM) in the neck and positive tenderness on direct spinal palpation in the lumbar region. [R 318] Dr. Morton found the plaintiff could "squat and rise [without] assistance approximately 10% of normal secondary to pain in the knees." [R 318] The plaintiff was noted to walk with a limp secondary to right knee pain. [R 318] Dr. Morton concluded: "Based on my medical evaluation, this claimant's ability to do work-related physical activities such as sitting standing, walking, carrying, handling, and lifting objects and traveling may be decreased secondary to patient's current condition." [R 319] Dr. Morton's diagnostic impression included residual low back pain due to multiple orthopedic injuries sustained in a motor vehicle accident in 1991, post traumatic arthritis in the left wrist and ankle, status post total right knee arthroplasty with residual right knee pain, and residual left TMJ dysfunction. [R 319]

A Neuropsychological Testing Report from Dr. Novack dated October 9, 1996, found the plaintiff was "having difficulty with cognitive abilities that might suggest history of traumatic brain injury." [R 320] He was "exhibiting difficulties with learning and recalling new information." [R 320] The report states that "Mr. Holt is definitely depressed" and that his "emotional status is such that he cannot organize himself to pursue appropriate activities." [R 320] Dr. Novack was of the opinion that "[g]iven his present emotional status, the pain disorder, and his perception of his cognitive abilities, it does not appear likely that Mr. Holt will be returning to any type of competitive employment." [R 320] Dr. Novack noted the presence of "pain behavior" but stated that "it did not seem to be exaggerated." [R 326] On a supplemental questionnaire, Dr. Novack indicated moderate impairment in several categories, and moderately severe impairments in performing work requiring frequent contact with others and in performing complex tasks. [R 330]

Dr. Ganuza conducted a consultative examination on May 18, 2000, and noted the plaintiff to be in "mild to moderate distress." [R 369] The plaintiff was noted to walk with a limp. [R 370] Heel and toe standing produced pain in the knees, and squatting was limited with pain in the knees, right hip and lower back. [R 370] The cervical spine was found painful on motion in all directions and the plaintiff exhibited guarding of the neck. [R 370] ROM seemed limited due to pain. [R 370] The lumbar spine was painful to palpation and he had pain with motion in all directions. The Lasegue maneuver did not elicit lumbar pain, but did cause some pain in the right hip. [R 370] The diagnostic impression was HNP [1] at C4–5 and possibly 5–6, lumbar spondylosis,[2] and possible

---

1. Herniation of nucleus pulposus—rupture or prolapse of the nucleus pulposus into the spinal canal. *Dorland's Illustrated Medical Dictionary* 758 (27th Edition).

2. Spondylosis is defined as "ankylosis [imobility and consolidation of a · joint due to

disease, injury, or surgical procedure] of a vertebral joint; also, a general term for degenerative changes due to osteoarthritis." *Dorland's Illustrated Medical Dictionary* 1567, 91 (27th Edition). Lumbar spondylosis is defined as "degenerative joint disease affecting the lumbar vertebrae and interver-

degenerative arthritis of the right hip. [R 370] An addendum to Dr. Ganuza's report contained interpretations of x-ray scans which Dr. Ganuza concluded showed spondylosis with disk space narrowing in the cervical spine. [R 371] The x-rays also showed abnormalities in the lumbar spine, fibula and knees. Dr. Ganuza completed a medical source statement limiting the plaintiff to a total of 2 hours combined standing and walking in an eight-hour day, limited him to frequent lifting of no more than 10 pounds, and 20 pounds occasionally. [R 372]

Dr. Bentley performed a consultative psychological evaluation on May 24, 2000, and noted that "[m]any individuals with the severity of [plaintiff's] depression, chronic pain and loss of day to day functioning" exhibited the same MMPI profile. [R 379] He concluded that the clinical scales of the MMPI "were suggestive of severe psychiatric problems as previously described." [R 379] Dr. Bentley noted the plaintiff "appears to suffer a moderate to severe degree of chronic pain." [R 378] Dr. Bentley also noted there was "no obvious evidence of the claimant exaggerating his symptoms for secondary gain." [R 377] Dr. Bentley was of the opinion that the plaintiff's "multiple injuries and the severity of his pain disorder would appear to substantially preclude him from sustaining most work related tasks. The likelihood of any improvement in his functioning is guarded at best." [R 378]

Dr. Swillie noted on December 1, 2000, that MRI and MRA scans "fail to show any significant abnormalities to suggest demyelinization or vasculopathy as reasons for the numbness and weakness in his left arm and leg." [R 413] It was noted the plaintiff continued "to have facial numb-

ness, crawling and visual disturbances at times." [R 413] Physical examination found the plaintiff walked with a cane and moved slowly due to pain in his neck and back. [R 413] The diagnosis was:

1. Left facial numbness that has been present since his accident in 1991.
2. Neck pain and cervicogenic headache
3. Back pain
4. Left leg pain and numbness.

[R 413]

■ The totality of the medical evidence shows that the ALJ's determination that the plaintiff's condition had improved to the point of allowing work is not supported by substantial evidence. When the plaintiff's physical and psychological impairments are considered in combination, it is clear the plaintiff's condition had not improved sufficiently to allow work. The ALJ, in discrediting the reports of the treating and consulting doctors, shows a disinclination to consider any evidence favorable to the plaintiff. For example, Dr. Bentley's observation that the plaintiff appeared to be suffering from moderate to severe pain was discredited because "Dr. Bentley was to have evaluated the claimant's mental impairments only and his conclusion that the claimant suffered a moderate to severe degree of chronic pain was apparently based solely on the claimant's subjective allegations ...." [R 23–24] As for Dr. Bentley's opinion that the plaintiff's condition would substantially preclude work, the ALJ again noted Dr. Bentley was not to evaluate impairments other than mental. [R 24] Even though Dr. Bentley is a psychologist, and would seem to be competent to give his opinion as to whether the plaintiff appeared to be in

tebral disks, causing pain and stiffness, sometimes with sciatic [the sciatic nerve, the largest nerve of the body, originates in the lower spine and proceeds into the legs]

radiation due to nerve root pressure by associated protruding disks or osteophytes." *Dorland's Illustrated Medical Dictionary* 1567, 1121, 1114 (27th Edition).

pain, the ALJ gave these opinions "no weight." [R 24]

The ALJ likewise refused to consider Dr. Novack's opinions:

Dr. Novack reported that given the claimant's present emotional status, his pain disorder, and his perception of his cognitive abilities it did not appear likely that he would be returning to any type of competitive employment. It is significant that Dr. Novack did not report that the claimant was unable to return to competitive employment.

[R 23] This is a remarkable statement from the ALJ. Dr. Novack is a neuropsychologist. His report covers 10 single spaced pages. Clearly it was his medical opinion that the plaintiff would not likely be returning to any type of competitive employment, due to his mental and physical impairments.

The ALJ refused to credit Dr. Morton's opinions: "Dr. Morton, who examined the claimant in June 1996, reported that his work related physical activities might be decreased due to his injuries, but he gave no indication that he believed the claimant to be completely disabled due to any impairment or combination of impairments." [R 23] While it is true that Dr. Morton did not express an opinion that the plaintiff was totally disabled, he clearly believed the plaintiff's ability to perform work related activities was impaired.

Even though the ALJ places great weight on Dr. Morton's failure to give an opinion of total disability, he discounts just such an opinion by Dr. Flanagan. [R 22] The ALJ's discussion of Dr. Flanagan's opinion shows the extent to which he went to discount any evidence favorable to the plaintiff:

Dr. Flanagan reported on May 31, 1996, that the claimant was 100 percent disabled since sustaining multiple fractures in September 1991. However, Dr. Flanagan further reported that the claimant would be undergoing lumbar spine surgery, cervical spine surgery, and left total knee replacement arthroplasty in the near future. The claimant apparently never had those surgeries and it is likely that Dr. Flannigan [sic] based his conclusions as to the claimant's level of disability on the assumption that he would require those surgeries. The claimant has not required those surgeries. I therefore assign Dr. Flanagan's conclusion that the claimant was 100 percent disabled little weight.

[R 22] Dr. Flanagan's report is clear. It begins: "Mr. Holt *is* 100% disabled and *has been* since . . . 1991." [R 398] (emphasis added). There is no qualification to this opinion and no indication it is in any way dependent upon the need for additional surgeries. The ALJ simply chose to afford little weight to an opinion that supported the plaintiff's disability.

## CONCLUSION

From the above it is clear that the ALJ did not fairly consider the plaintiff's case. When a doctor opined the plaintiff's ability to perform work related activities would be restricted, it was discounted because he did not state the plaintiff was 100 percent disabled. When a doctor opined the plaintiff was 100 percent disabled, it was discounted because it might have been based upon a need for surgery. When a doctor opined that the plaintiff would be unlikely to return to competitive employment, it was discounted because he did not state that the plaintiff could not return to competitive employment. When a psychologist opined the plaintiff suffers from moderate to severe pain, and that his condition would substantially preclude work, it is discounted because he was not supposed to consider the plaintiff's physical condition.

The reports of the plaintiff's treating and consulting doctors show without doubt

that his condition had not improved sufficiently so as to allow him to return to work. In order to find the plaintiff not disabled, the ALJ distorted the reports of doctors, relied upon semantical nuances of language, and speculated as to the unstated reasons behind a doctor's unequivocal opinion that the plaintiff was 100 percent disabled. This is a case where "the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." *Davis v. Shalala,* 985 F.2d 528, 534 (11th Cir.1993). In such a case the action should be reversed and remanded with instructions that the plaintiff be awarded the benefits claimed. *Id.* An appropriate order will be entered contemporaneously herewith.

### FINAL ORDER

In conformity with and pursuant to the memorandum opinion entered contemporaneously herewith, it is

ORDERED, ADJUDGED and DECREED that the decision of the Commissioner of the Social Security Administration is hereby REVERSED, and the case is REMANDED to the Commissioner with instructions that the plaintiff be awarded the benefits claimed. It is

FURTHER ORDERED that the Commissioner withhold from payments that are determined to be due the plaintiff under this order an amount not to exceed 25 percent of the total amount of disability benefits to which the plaintiff is entitled, pursuant to the provisions of 42 U.S.C. § 406(b). The Commissioner is directed to advise the court of the amount withheld so that the matter may be set for final determination of the amount of attorney's fee to be allowed plaintiff's counsel for services rendered in representing plaintiff in this cause.

It is further ORDERED pursuant to Rule 54(d)(2)(B) of the Federal Rules of Civil Procedure, that plaintiff's attorney is hereby granted an extension of time in which to file a petition for authorization of attorney's fees under 42 U.S.C. § 406(b) until thirty (30) days subsequent to the receipt of a notice of award of benefits from the Social Security Administration. ***This order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act***